Good morning ladies and gentlemen. My first case for argument is Collazo v. Siragusa. Siragusa v. Collazo. Mr. Cook. Good morning. May it please the court. Good morning. My name is Patrick Cook. I represent the appellants, Dennis Siragusa, Robert Joseph Siragusa, and Dr. Robert Siragusa, both in his individual capacity as well as his trustee for the Employee Benefit Trust. You'll have to speak more slowly. As well as for his trustee for the Employee Benefit Trust and its predecessor. This appeal comes to this panel this morning in connection with an adversary proceeding that was filed in a bankruptcy court in which the Siragusas sought to accept from discharge certain claims pursuant to Section 523A2A for debts that were procured by false pretenses, false representations, and actual fraud. The bankruptcy court conducted a two-day trial and entered certain findings of fact and conclusions of law. What kind of claims are these in the bankruptcy? Are they claims on the contract or claims of liability for fraud? They're claims of liability for fraud. You're not seeking to recover on the contract? No. Well, that's your choice, I suppose. But the statute of limitations for contract is an awful lot longer than the statute of limitations for fraud. It is, but with contract damages, as you know, Judge Easterbrook, if there was just a breach of contract here, and that was what was in play, these debts would have been discharged by now. No. There is a fraud exception to discharge. You may not appreciate that you can bring a claim on a contract and then oppose discharge on the ground that the debts are attributable to fraud. But you've just told me that that's not what you're doing, that your claim itself rests on fraud. Well, the claim as framed in the adversary proceeding was premised on fraud. Well, that's the only thing that's before us. And for purposes of accepting these claims from discharge and having judgment entered in connection with the same. All of the fraud is incident to the contract. I just don't understand the way the bankruptcy fraud exception works, but you have made your choice. You certainly haven't argued in your brief the line I opened to you. So the claim, in fact, is brought pursuant to the contract, is on contract, and fraud, accepting these claims from discharge based on 523A2A. But it is incident to and on the contract, multiple contracts, into which the Syraguses entered with this debtor, Arturo Colazzo, in connection with loans that were provided in certain Chicago conversion projects, as well as an Arizona conversion project. Before you today are three issues that the Syraguses have raised on this appeal. The first relates to the conclusion by the Bankruptcy Court that the Syraguses failed to prove fraud in connection with the Chicago loans. The second issue relates to the statute of limitations and the conclusion by the Bankruptcy Court that Robert Syraguse's and the retirement plan's claims are all time-barred. And the third, that the Bankruptcy Court erred and District Court erred in failing to enter a judgment in Dana Syraguse's and Robert Joseph Syraguse's favor after finding that certain of their claims were accepted from discharge. With respect to the first issue, the fraud as it relates to the Chicago loans, the Bankruptcy Court focused appropriately at the time the Chicago loans were made. But you can find the window through which he was evaluating the intent to deceive very narrowly. He looked only at the notes themselves. In fact, he indicated in his own opinion that the only evidence dating back to the time of the Chicago loans are the notes. Well, that's just not true. There was conduct before the notes that should have been taken into consideration. There was the notes themselves that should have been more carefully evaluated. And then subsequent conduct after the Chicago loans, all of which revealed the state of mind and intent to deceive by Colazzo at the time he entered into these loan arrangements, these investment arrangements with all of the Syraguses. We know that because at least two of the notes, the Eddy notes and the Syraguse notes, identified the wrong lender, the wrong construction loan lender, the wrong mortgagee. That was so because Colazzo had no intention of repaying the Syraguse loans immediately following the retirement of the first mortgagee, which is what he was obligated to do under paragraph 16 of each of the loan agreements. He had no intention, so he didn't care what lender appeared in the loan agreements. And we know that because at some point during the course of this trial, Colazzo and his partner testified that the entities to whom and to which the Syraguses loaned monies were not even responsible for repaying the loans. The entities to which the Syraguses loaned monies were not the obligors. Instead, C.G. Development Group was. C.G. Development Group was the developer of all the conversion projects, just not the four Chicago projects in which the Syraguses invested, but all the conversion projects in which Colazzo and his partner Goldman were involved. The problem is no one told Robert Syraguse of that. C.G. Development Group doesn't appear anywhere in the notes that were given to Robert or Dana in connection with the Chicago loans. Nobody told Robert that C.G. Development Group was in fact the obligor. C.G. Development Group even carried the loans on its books. Robert didn't know that either. We also know that Colazzo did not intend to pay these loans out and retire the Syraguse debts after paying the forced mortgages because he started developing transferee LLCs even before he acquired the Waveland property. The Waveland property was the first property in which Robert Syraguse invested, he and along with the retirement plan. He formed the transferee LLC, Art-Man Investments LLC, before the property was even acquired, before the conversion even began. Contrary to the bankruptcy court's conclusion and Colazzo's plea both in the briefs here and below, the transfer of units that eventually occurred from Waveland and Berry to Art-Man Investments were not the result of sluggish sales. In fact, at the time this transferee LLC was created, it was not possible for Colazzo or anyone else for that matter to know how sluggish the sales might be, how quickly the sales might go, whether there would be any sales at all. Yet before he even started the conversion project in 1210 Waveland, he began forming the transferee LLCs and that was because there was always a plan in place to transfer the unsold units immediately following retirement of the first mortgage to these transferee LLCs and out of the LLCs, the borrower LLCs, to which the Syraguses loaned monies. Goldman, Arturo Colazzo's business partner, also testified in this case that it was their business plan and practice to transfer these units. So the plan was in place before Robert Syraguse loaned a single dollar to Colazzo or any of his investment, excuse me, conversion projects. The loans made by the Syraguses were subordinate only to the construction loans and the first mortgages. Once those were retired, the Syraguses were to be paid out. It was never the intent of Colazzo to do that for the reasons just articulated and the reasons raised in the briefs suggesting that he really did intend to... And this was insufficient to prove that there was a false representation of fraudulent scheme in place at the time the debt was incurred. So is that incorrect? No, it's not correct. It's not correct for the reasons I just identified, Your Honor. In part, there were actual express fraudulent representations in the notes regarding the actual construction lenders for these particular conversion projects. So that was glossed over entirely by the bankruptcy court. Beyond that, subsequent conduct and conduct before the execution of the notes and the exchange of monies for notes also should have been considered. The totality of circumstances should have been weighed and taken into account in evaluating the... As far as subsequent conduct, would that be fraud if when he made the deal with the Syraguses, he intended to carry it out in honest fashion? And then later there are developments and he can't do it and so on. That wouldn't be fraud. No, but in this case it is because if it reflects back to the debtor's state of mind... What do you mean by reflects back? Well, the subsequent conduct was all part of the bigger scheme that was, as I indicated earlier, began to unfold even before Robert Syraguse loaned any monies. The transfer ELCs were beginning to be formed before the conversion project, 1210 Waveland in particular, even began. So he had these transfer ELCs ready to go. It wasn't because of sluggish sales. He couldn't have anticipated what the sales were going to be a year from then, two years from then, three years from then. He didn't. He had a plan in place to transfer the unsold units as soon as he retired the construction on the first market. But did the transfer of the ELCs make it impossible for him to repay the Syraguses? It might have, but he didn't. He set it up this way, to transfer the units, to remortgage them anew, not to pay the Syraguses, because he needed more capital for his investment. He transferred the ELCs, but he still owed the Syraguses money. Yes. Right? Yes. So the fact that he didn't pay them, isn't that a separate, not quite separate from whether he intended to defraud them when he transferred the ELCs? It is, if it's in fact separate. Respectfully, Judge Posner, where the conduct by the debtor in this particular instance reflects back to the state of mind in entering into these notes. As I said, he had these transfer ELCs set up to go before he even took a dollar from Robert Syraguse. So the plan was in place to strip the assets away from the borrower ELCs, not to pledge them and get money in order to pay the Syraguse loans, but instead to get whatever capital he needed to continue whatever other conversion projects in which he was involved. None of the monies, and there is no evidence in the record, that any new monies that were obtained by the transfer ELCs went to those particular projects. They weren't used, no monies were used to complete 1210 Waveland or 643 Berry or 1300 Eddy or 2801 Seminary. There's no evidence in the record indicating as much. They mortgaged these properties anew for the purposes of getting more capital for additional projects in which they were involved. They had nothing to do with the Syraguses. It also was actual fraud in that respect, Your Honor, because it was contemplated at the outset, as I've indicated, but the actual transfer of the units was done to hinder and delay payment to the Syraguses. They never intended to pay the Syraguses, as was promised under the notes, and that was immediately following the retirement of the construction loans and first mortgages. That was never their plan. In fact, they were going to get to the Syraguses whenever they got to the Syraguses, but that's not what they agreed to do. And here, when you transfer the properties, such as they did, with the actual intent to hinder, delay, and defraud the Syraguses, which was in play, they in fact committed actual fraud as well, a violation of the Uniform Fraudulent Transfer Act. The statute of limitations issue also is at play, Your Honor, and as it relates to that, the Bankruptcy Court found that the issues related to Roberts loans and the retirement plans loans had expired, the time in which they could bring their claims had expired because of a July 2007 telephone conversation he had with his daughter. That wasn't the case. When that conversation purportedly occurred, he went to Colosso, as he had been doing for two-plus years, asking and inquiring about the status of the loans. They were already in default for more than two years now. And Colosso provided them with an accounting in October 2007. In that accounting, the properties were reflected and the interest that accrued was reflected. What was not reflected, Your Honor, was the fact that these entities, Waveland Seminary, Berry, and— I'm sorry. What was not disclosed? What was not disclosed was that they were assetless shells. That what? That they were assetless shells, that they could not financially repay these loans, that they had no assets with which to repay these loans. Again, CG Development Group carried this debt on their books, but nobody told Robert Syraguse that. If the statute of limitations was implicated at all, Your Honor, it was implicated only as to the YETI project in July 2007. That's it. These were individual, one-off projects. That's all. And so if he learned through that telephone conversation that the last of the YETI units had been sold, then the statute of limitations arguably may have begun to run as to that project only. But only in discovering and investigating further the YETI loans and the YETI entity and learning then of the transfer of the units from YETI to PRJ, et cetera, would that have triggered the statute of limitations as to all the others. We ask that these decisions be reversed. Okay. Thank you, Mr. Cook. Thank you, Your Honor. Mr. Herzog? Good morning. My name is David R. Herzog, and I represent the defendant, Ampli Arturo Collazo. May it please the Court. Judge Lerner, do you have a motion? I don't understand the statute of limitations ruling. So Siragusa, the doctor, he's a doctor. He's not, you know, finance or anything. And his daughter is working for Collazo, right? Julia, is that it? That is correct, Your Honor. And she's kind of his right-hand man. She is. She's not a man, but right-handed something, right? Right-hand assistant. Yeah. Well, why wouldn't Siragusa, not being in finance or construction or anything like that, why wouldn't he expect his daughter to keep him advised if there was any problem with repayment other than delay, right? So Collazo was slow in paying. But on the other hand, you know, it's construction. I'm sure that delays are very common. So wasn't he lulled by his daughter into thinking that, you know, Collazo was slow, but he was going to pay? I don't believe so, Your Honor, because in the record, Dr. Siragusa relied and discussed these matters with Collazo and indicated that he had very little to say. I mean, he talks to his daughter, doesn't he? And, you know, her testimony sounds really evasive, you know? I mean, that is vague. And I think that there is a critical conversation with his daughter, which was elementary to the bankruptcy court's decision as well as to the district court opinion. And that conversation is where the daughter told her father that the last unit in Eddy had not been sold. The one? I'm sorry? The last unit in the Eddy project had been sold by her. She actually sold the last Eddy unit. But the fact that it's sold doesn't extinguish Collazo's debt. Well, it doesn't extinguish Collazo's debt. But what the bankruptcy court's point was, that what was key to the representation... Siragusa, this Siragusa, this Robert Siragusa, he's not a lawyer or anything. What does he know? Why would he attach significance to the fact that Collazo had sold something? He doesn't know anything about Collazo's resources and plans and anything like that. If she said to him, look, you know, that he sold his last asset, he has no money, you better do something, he's not going to be able to pay you. Why didn't she say that? She's not a very loyal child. Well, she informed her father that the last unit in Eddy had been sold. I know. Why didn't she explain to him what the significance of that is? Because I believe the significance and what Judge Weedoff found was significant was that Dr. Siragusa was relying on the sale of those units to pay off the note. And the fact was that the notes hadn't been paid for years. He doesn't know what resources Collazo has. All he knows is Collazo owes him this money. That Collazo is a slow payer but had paid on this previous property. Now, if she had said to him, he sold the only asset he has that would enable him to repay his debt to you, Dad, that would be one thing. But she didn't say that. How is he supposed to know what the significance of Collazo's having? I mean, maybe that's a good thing. Collazo has sold his last property. Now maybe he has a lot of money from the sale. Well, these were different borrowing LLCs. Well, what does Siragusa know about this? Well, because each of the LLCs issued the notes. They were the obligor under each of the notes, the LLCs. And the Eddy LLC issued these notes so that one would expect that when the last unit was sold that note would be retired. Well, you might think that, but why would Dr. Siragusa think that? All he knows is that Collazo owes him money. He doesn't know what the money comes from. He's got his daughter working for Collazo. You'd think he'd think, Siragusa would think, well, look, I'm safe. So I have my daughter working for this guy. If he's not going to repay me or something, she'll tell me. The transcript of her testimony, she's so evasive. And I don't know, it's very strange. Wouldn't it be good to have some factual development of what she was thinking and what did she know about Collazo's dreadful financial situation? Well, Dr. Siragusa said that he did not rely upon the information from his daughter other than the fact that she informed him of the sale. He relied upon what Mr. Collazo was telling him. Relied on what? Relied upon whatever his discussions were with Mr. Collazo. And he said he was repeatedly asked the question of whether or not his daughter had informed him of certain things, and he repeatedly said, no, I didn't deal with my daughter on these things. I dealt with Mr. Collazo. Yeah, so what? What does that add up to? Collazo doesn't tell him he's not going to pay him. My daughter doesn't tell him that Collazo doesn't have any money left. I don't know what Siragusa's supposed to do. Well, and again, I think that the representation here is the trigger for the doctor to have made an investigation because the notes have been unpaid for your... He's a doctor. He doesn't know anything about construction industry and finance. He's got his daughter working for the guy who owes him the money. She doesn't tell him anything. It's not a question of whether he's a doctor, Your Honor. It's a question of what a reasonable person... I don't agree with that. Suppose you have an unreasonable person and you deceive this person. You say to some dope, you say, look, don't worry about this. The statute of limitations is 50 years. And this person, being a dope, says, all right, that's what you say. I have 50 years to sue. Now, you say that person is caught by the statute of limitations even though the defendant is deliberately deceiving him, exploiting his ignorance? No, because when independent knowledge or information... No, you ask him to answer my question. Is the statute of limitations... Is the plea of the statute of limitations decisive in my case? I believe it is, Your Honor. I believe it is. Well, that doesn't make any sense because you can certainly defraud a person by deceiving him as to what the statute of limitations is. You tell a person who doesn't know better the statute of limitations is X and it's really a tenth of X. You can't plead the statute of limitations. I mean, you can plead it, but it's not going to be effective because you've defrauded this sucker, right? But nobody told Dr. Siragusa what the statute of limitations was in this case. And that makes it better? They don't even know what a statute of limitations is. The point is it's not a subjective test. The discovery rule... No, no. Look, you're wrong. Because if you have someone who deceives another person about the statute of limitations, a person who has no legal sophistication, that's a form of fraud. But there was no evidence here that anybody deceived Dr. Siragusa. Well, I don't understand the daughter's role in all this. I don't think it was adequately explored. Well, I think that the court's decision was based on the fact that there was no misrepresentation, there was no intent to deceive at the time these loans were made. There was no plan in place. There was no scheme in place. The bankruptcy court found... Well, what was all this business of shifting these LLCs into other enterprises? What was the purpose of that? The testimony was clear. John Goldman testified that there were sluggish sales, that it was unanticipated that the units would not be sold at the completion of the project. And in order to create additional capitalization, to create what Goldman called a liquidity event, these LLCs were formed and the unsold units were transferred. And that extinguished Collazo's debt, transferring these properties? Well, did it extinguish the LLC's debt? Collazo testified that he always recognized that his development company, or he had an obligation to pay these debts. Well, it would have been easier to pay them if he hadn't gotten rid of the LLCs. Well, except for the one fact that the Waveland units were transferred after the notes were overdue, and in fact were paid. Some of them were paid, but others weren't. Others were not. Now, why weren't the others paid? Because they probably ran out of money. Well, but would he have run out of money if he hadn't transferred the LLCs? Don't know the answer to that question. Well, I don't understand. If he owes money and it's secured by these assets he has, he can't just transfer the assets in order to extinguish his debt. I agree. But that's what he did. Well, but the question here, the question is, did he intend to do so when the loans were made? Because that would be the essence of fraud. I don't really understand that either. There has to be an intent to deceive at the time the loans were made. The subsequent conduct by Mr. Collazo is not indicative and does not establish a fraud. Why not? I don't understand. Because there had to be an intent that that's what he was going to do at the time that the loans were originally made. And as the Bankruptcy Court found, and as the District Court also affirmed, there was no intent to do that. Collazo testified that he did not intend to transfer any units. Yeah, who'd believe that? He fully intended to pay these loans. I don't believe it. Well, but he paid part of them. So if in fact he didn't intend to pay it, then it seems odd that he didn't. Why isn't the fact that he did transfer these LLCs and extinguish, he thought, his debt to Siragusa, why doesn't that cast a lot of doubt on his original bona fides? He probably was thinking of this all the time. It's his scheme. There was nothing that showed that he had done this in the past. There was no evidence to show that such a scheme existed when he originally obtained them. I think that's a very naive response. That's the finding of the Bankruptcy Court. Didn't get it. And there was simply no showing that that was his intention. And I think in order to prevail under 523A2A, one has to show that there was an intention. But he knew that when he transferred these LLCs, he'd never be able to pay back Siragusa. Well, I'm not sure that that's not in the record. And also, again, that subsequently... Of course that's what he did. That's how he extinguished the debt. That's fraudulent behavior. But it's not what created the debt. And in order to be the actual fraud, that conduct has to create the debt. That didn't create the debt. We'll see what difference that makes. Still fraud. But fraud to be... Is it your position that the fraud bar in 523A2A applies only when there are false statements, statements false at the time made? Yes, I believe that the statements here... You're aware that this circuit has held the opposite, that a fraudulent scheme allows for the invocation of that. There's a conflict among the circuits. The Supreme Court has granted certiorari on it. And I notice, of course, that Mr. Cook has not raised that question. But you're assuming... Your argument assumes a position contrary to the law of the Seventh Circuit, which Mr. Cook has not contested. Well, I don't believe that there's evidence of a fraudulent scheme that was in place at the time that these laws were made. Well, that would have been an interesting question to explore had anybody bothered to explore it. So with respect, then, again, I believe that the bankruptcy court's finding, the district court's finding, is not clearly erroneous here. There was no plan or scheme in place at the time these laws were made. And I would respectfully request that... Okay, thank you, Mr. Herzog. Thank you. Mr. Cook, your time has expired. You can have another minute if you'd like. Thank you, Judge. We're left off with the statute of limitations. But I do want to address Judge Easterbrook's query earlier about... You'll have to speak up. You're just mumbling. Excuse me, Judge Posner. I'd like to address Judge Easterbrook's comments earlier about not having addressed the scheme. Really, you've been told now several times, the bench cannot hear you. You need to speak up and enunciate. Mumbling won't do it. My apologies, Judge. I wanted to address the issue raised by you, Judge Easterbrook. This was... I still can't hear you. I wanted to address the issue you raised just a moment earlier with counsel regarding the scheme. This was an action premised on a breach of contract, an action premised on... You told me when I asked you directly that this is not an action premised on breach of contract. To the extent that it was confined to contract... The implied argument in the Court of Appeals is a little late to change your tune about that. Understood, Judge. My point is, when I first understood your question, my thoughts turned to suing on contract and how debts related to contract would be dischargeable in a bankruptcy. That's what I thought the question spoke to, Your Honour. It wasn't remotely what my question was, and I was clear about what I was asking. And I apologise for my misunderstanding. No, no, you don't apologise to me. I think you need to apologise to your clients. Thank you, Your Honour. That is? It is. Okay, well, thank you very much, Judge Counsel. Thank you.